UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| CHARLES E. HOWELL, JR., | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL NO. 3:10cv389 |
| | ) |
| ELKHART COUNTY SHERIFF | ) |
| MICHAEL BOOKS, et al., | ) |
| | ) |
| Defendants. | ) |

OPINION AND ORDER

This matter is before the court on a motion for summary judgment filed by the defendants Elkhart County Sheriff Michael Books ("Books"), Jail Commander Samuel Naves ("Naves"), Classification Officers Rebecca Lehman ("Lehman") and Maria Beato ("Beato"), and Sergeant John Rosson ("Rosson"), on November 7, 2011. The plaintiff, Charles E. Howell, Jr. ("Howell"), proceeding pro se, filed his response on December 5, 2011, to which the defendants replied on December 22, 2011.

For the following reasons the motion for summary judgment will be granted.

Summary Judgment

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Not every dispute between the parties precludes summary judgment, however, since "[o]nly disputes over facts that might affect the outcome of the suit under the governing law" warrant a

trial. Id. To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010).

## Discussion

Howell, a prisoner currently housed at the Bellamy Creek Corrections Facility in Michigan, filed a pro se Complaint on September 13, 2010, pursuant to 42 U.S.C. § 1983, alleging violation of his federally protected rights while he was confined at the Elkhart County Corrections Facility (the "Corrections Facility") as a pretrial detainee. Howell claims that defendants failed to protect him from another Corrections Facility inmate and as a result Howell suffered injuries.

Howell alleges in his Complaint that when he arrived at the Corrections Facility as a pretrial detainee, there was a "keep-separate" instruction in place requiring the facility to keep Marcus Kidd ("Kidd") separate from Howell because Howell had testified against him in a criminal trial in Michigan. Howell asserts that Defendants were aware of the keep-separate instruction, that Defendants were aware that Kidd posed a threat to Howell, and that on May 16, 2010, Defendants "moved [Kidd] into the same dorm with the plaintiff, despite the order to keep them separated." According to the Complaint, "[Kidd] then severely assaulted plaintiff Charles E. Howell, Jr., causing serious bodily injury."

On December 2, 2010, the court issued its Opinion and Order allowing Howell to

proceed against Defendants for damages on his claim that they were deliberately indifferent to his safety and failed to protect him from being attacked by an inmate they knew posed a threat to him.

Howell was transported from Bellamy Creek Correctional Facility in Ionia, Michigan, ("Bellamy Creek") and booked into the Corrections Facility on May 11, 2010, on charges of armed robbery, a B felony, and criminal confinement, a B felony. (Howell Dep. 20:11-21:5; Ex. 1 to Howell Dep.; Eash Aff. ¶ 10.) On August 19, 2010, Howell was sentenced on two counts of armed robbery and two counts of criminal confinement. (Howell Dep. 21:17-22:19; Ex. 2 to Howell Dep.) He remained incarcerated at the Corrections Facility until September 17, 2010, at which point he was transported back to Bellamy Creek. (Howell Dep. 20:16-21:9; Ex. 1 to Howell Dep.).

The duties of the classification officers at the Corrections Facility include interviewing and classifying inmates for purposes of assigning them to the Corrections Facility's various wards. (Morris Aff. ¶ 4.) In May 2010, the officers assigned to inmate classification at the Corrections Facility were Morris, Rosson, and Beato. ( Morris Aff. ¶ 5.) As part of the regular classification of inmates, all new inmates are interviewed by a classification officer to determine their appropriate housing. (Morris Aff. ¶ 6; Eash Aff. ¶ 4.) In determining where an inmate should be housed, classification officers use the Cottrell objective jail classification system recognized by the National Institute of Corrections. ( Morris Aff. ¶ 7;  Eash Aff. ¶ 5.) The following criteria are considered in determining where an inmate should be assigned: current charge, prior convictions, escape history, disciplinary history, and prior felony convictions. (Morris Aff. ¶ 8; Eash Aff. ¶ 5.) New inmates are generally interviewed by classification officers

within 72 hours of their booking. (Morris Aff. ¶ 9; Eash Aff. ¶ 6.) Each day, a classification officer determines where to house new inmates who have gone through their classification interview but have not yet been assigned to a ward. (Morris Aff. ¶ 10; Eash Aff. ¶ 7.) The classification officer making this determination places the inmate's name on a "move list," and other corrections officers then transport the inmates on the move list to the wards indicated by the move list. (Morris Aff. ¶ 11; Eash Aff. ¶ 8.) If, due to conflicts, two inmates should not be housed in the same ward, a keep-separate instruction is set in the Corrections Facility computer system. (Morris Aff. ¶ 12; Eash Aff. ¶ 9.) The keep-separate instructions are reviewed as part of a classification officer's creation of the move list. (Morris Aff. ¶ 12; Eash Aff. ¶ 9.)

Prior to Howell's May 11, 2010 booking in the Corrections Facility, the Sheriff's Department received a letter from the Elkhart County Prosecutor's Office indicating that Howell needed to be transported to the Corrections Facility from Bellamy Creek. (Eash Aff. ¶ 11.) The same letter indicated that Howell and Kidd could not be transported or housed together and included as one of its enclosures a handwritten note from Howell indicating the same. Id. The day that Howell was booked in the Corrections Facility on May 11, 2010, an officer noted on Howell's prisoner intake sheet and on Howell's booking screening sheet that Howell and Kidd should be kept separate. (Eash Aff. ¶ 12.) Howell was classified as maximum security based in part upon his felony charges, and he was moved to maximum security Ward K45 the same day. (Eash Aff. ¶ 13.)  Kidd was transported to the Corrections Facility on May 14, 2010. (Eash Aff. ¶ 14.)  The same day, the Corrections Facility entered a keep-separate instruction in the Corrections Facility computer system to keep Howell and Kidd separate. (Eash Aff. ¶ 14.)

On May 16, 2010, Howell was still in Ward K45. (Eash Aff. ¶ 15.) On that date, Morris

4

was the classification officer in charge of preparing the move list. (Ex. 3, Morris Aff. ¶ 13.) In the normal course of Morris' activity as a classifications officer, she would prepare a move list on a given day by reviewing the classification status of all inmates in booking who had had a classification interview and were waiting to be transferred to regular housing wards in the Corrections Facility. (Morris Aff. ¶ 14.) From her computer, which had access to the Corrections Facility's computer system, Morris would add these inmates one by one to the move list, which designated the wards where the inmates were assigned to be housed. Id. Before adding each inmate, Morris would carefully review his or her inmate classification information in the computer system to determine where he or she could be safely and appropriately housed. Id. As part of this review, Morris would examine each inmate's profile on the computer system to determine whether or not the inmate had any keep-separate instructions associated with him or her. Id. If an inmate had a keep-separate instruction, Morris would review the instruction and ensure that that inmate was not moved to a ward that housed any inmate that he or she needed to be kept separate from. Id. This regular procedure was in accordance with Corrections Facility policy and procedure. Id.

    On May 16, 2010, after Morris had initially prepared the move list for the day, she was present in booking toward the end of first shift and a first shift booking officer asked her where new inmate Kidd should be housed. (Morris Aff. ¶ 15.) At that time, Kidd had not yet been placed on the move list. (Morris Aff. ¶ 16.) When asked where Kidd should be housed, Morris remembered that Kidd was classified as maximum security and remembered that there was an open bed that day in maximum security Ward K45. (Morris Aff. ¶ 17.) Morris added Kidd's name to the move list to be moved to Ward K45 and thereby directed the booking officer to

place Kidd into Ward K45. (Morris Aff. ¶ 18.) Before Morris made that decision, she acknowledges that she should have checked Kidd's data on the Corrections Facility's computer system, where keep-separate instructions for inmates are located. (Morris Aff. ¶ 19.) However, she forgot to check Kidd's data on the Corrections Facility's computer system, and therefore she did not see that there was a keep-separate instruction between Kidd and Howell, and it did not occur to her that Kidd and Howell should be kept separate. Id.(Morris Aff. ¶ 20.)

At 3:11 p.m. on May 16, 2010, the Corrections Facility's first shift officers moved Kidd to Ward K45, following Morris' instruction to house Kidd in Ward K45. (Morris Aff. ¶ 21; Eash Aff ¶ 16.) At that time, the Corrections Facility was in the process of locking down its wards for daily headcount. (Eash Aff. ¶ 16.) Headcount was completed at 4:29 p.m. and the cell doors in Ward K45 were unlocked. (Eash Aff. ¶ 17.) Medications pass began in the maximum security wards at 4:31 p.m. and was completed at 4:44 p.m., during which time nurses and officers came to each maximum security ward, including Ward K45, to pass out medications prescribed to inmates. (Eash Aff. ¶ 18.)

At about 5 p.m., Howell walked out of his cell and saw Kidd. (Howell Dep. 28:12-20, 39:21-40:4.) Kidd struck Howell multiple times over a period of a minute or less. ( Howell Dep. 39:21-41:15, 42:11-15.) Kidd may also have kicked or kneed Howell in the right shoulder. (Howell Dep. 109:2-12.) Kidd then walked away. (Howell Dep. 44:15-19.)

The wards in the Corrections Facility are under video surveillance, and each cell has intercom buttons which inmates can push to speak with corrections officers. (Eash Aff. ¶ 19.) At 5:02 p.m., Howell got up and pushed an intercom button, said that he was bleeding, and asked for an officer to come help him. (Eash Aff. ¶ 20; Overmyer Aff. ¶ 4; Howell Dep. 44:11-14,

6

46:15-19.) Officers then came into the ward and a Correct Care Solutions ("CCS") nurse came in to attend to Howell. (Overmyer Aff. ¶ 4; Howell Dep. 49:8-50:16.) Howell had been hit in the face and mouth and had some cuts on his head; he was bleeding, and the cell and call box were covered in blood. (Overmyer Aff. ¶ 4.) Howell told the officers that his co-defendant had hit him; the officers determined that Howell's co-defendant was Kidd and one of them told Kidd to pack his possessions to move to segregation. (Overmyer Aff. ¶¶ 4, 5; Howell Dep. 50:10-51:1.) While waiting for Kidd to pack his possessions, the officers located blood in Kidd's cell. (Overmyer Aff. ¶ 5.) At 5:08 p.m., officers escorted Kidd out of Ward K45 to segregation Ward K48.(Overmyer Aff. ¶ 5; Eash Aff. ¶ 22;  Howell Dep. 50:10-51:1.) The nurse examining Howell determined that Howell had suffered no head trauma but he had a laceration inside of his bottom lip on the right side and a couple of pinpoint areas to his upper lips from his teeth. (Strahle Aff. ¶ 6(d); Ex. A to Strahle Aff., CCS-000106, CCS-000131.) His face was cleansed and pressure was applied to his lower lip to stop the bleeding. (Strahle Aff. ¶ 6(d); Ex. A to Strahle Aff., CCS-000131.)

    After a physical altercation between inmates, the Corrections Facility moves any inmate involved in the altercation to the medical ward if needed or to a segregation ward until the facts of the altercation are reviewed. (Eash Aff. ¶ 21.) After the nurse examined Howell, she recommended that he come to the medical ward, but Howell told her he did not want to go there. (Howell Dep. 51:7-52:11.) At 5:12 p.m. an officer took Howell to segregation Ward K42B, where the officers let him change his clothes and clean himself. (Eash Aff. ¶ 22; Howell Dep. 52:16-25.) The same day, after examining Howell, the CCS nurses advised Dr. John Foster of the situation. (Strahle Aff. ¶ 6(d); Ex. A to Strahle Aff., CCS-000131.) Dr. Foster ordered

Amoxicillin to prevent infection and Ibuprofen for pain. (Strahle Aff. ¶ 6(d); Ex. A to Strahle Aff., CCS-000131 to CCS-000132.) At 7 p.m., a nurse administered the medications to Howell as ordered. (Strahle Aff. ¶ 6(d); Ex. A to Strahle Aff., CCS-000131.) By that point the laceration to the lower inside of Howell's mouth had stopped bleeding. Id. The nurse encouraged Howell to leave the laceration alone so it could heal properly and not get infected. Id. Howell also complained of nausea at that time. Id.

Howell stayed in segregation ward K42B the night of May 16, 2010. (Eash Aff. ¶¶ 22-23; Howell Dep. 52:16-25.) The following day, May 17, 2010, Howell was seen by a mental health professional in segregation. (Strahle Aff. ¶ 6(e); Ex. A to Strahle Aff., CCS-000021.) Howell was oriented to person, place and time; had a flat affect, was calm, exhibited normal cognition and cooperative behavior. Id. No psychiatric medications were prescribed. Id.

Later on May 17, 2010, Howell was moved back to Ward K45, and he remained in Ward K45 until his transport out of the Corrections Facility on September 17, 2010. ( Howell Dep. 53:1-3; Eash Aff. ¶ 23.) Following a hearing, Kidd was found guilty of physically assaulting or fighting with another inmate, and he received 25 days of disciplinary segregation. (Eash Aff. ¶ 24.) After Kidd finished serving his time in segregation, he was moved to Ward K47, where he remained until his transport out of the Corrections Facility on September 17, 2010. Id. Beato conducted a disciplinary hearing with Howell and found Howell not guilty of a disciplinary violation. (Howell Dep. 13:6-14:13.) After the altercation, Howell and Kidd were housed in separate wards in the Corrections Facility until the time that they were each transported out of the Corrections Facility. (Morris Aff. ¶ 23; Eash Aff. ¶ 25.)

Howell has never had any contact or communication with Books or Morris, and Howell's

only communication with Beato was in Howell's disciplinary hearing following the altercation, when she found Howell not guilty of a disciplinary violation. (Howell Dep. 9:19-23, 13:2-14:13.) Howell named Books, Naves and Rosson as defendants because of their general responsibilities as Sheriff, Warden, and Classification Sergeant, respectively, to oversee the system by which inmates are kept safe from those inmates who might harm them. (Howell Dep. 61:8-63:14, 64:1-16.) Howell only named Beato as a defendant because he was not sure whether it was Beato or Morris who made the decision to house Kidd in his ward. (Howell Dep. 63:15-25.) Howell does not allege or testify to any specific facts showing that Books, Naves, Rosson or Beato were individually involved with or individually participated in Kidd's assignment to Ward K45 with Howell.

Howell alleges that as a result of the altercation with Kidd, he had to have a tooth extracted and suffered injuries to his right shoulder and to his lip. (Howell Dep. 70:10-71:7, 76:23-77:13.) For Howell's complaint of dental pain and lip contusions, Howell was seen by Dr. Foster on May 25, 2010. (Strahle Aff. ¶ 6(h); Ex. A to Strahle Aff., CCS-000023, CCS-000111, CCS-000129, CCS-000135.) Dr. Foster entered an order for Ibuprofen 600 mg every day for 5 days and referred Howell to the Corrections Facility dentist, Dr. Dennis Carter, for further evaluation. (Strahle Aff. ¶ 6(h); Ex. A to Strahle Aff., CCS-000104, CCS-000119, CCS-000129.) Howell was seen by nursing staff on May 27, 2010, for a "post altercation bump" on his upper gum in front of his right tooth and was scheduled to see Dr. Carter for further evaluation. (Strahle Aff. ¶ 6(i); Ex. A to Strahle Aff., CCS-000103, CCS-000110.) Howell also saw nursing staff on June 21, 2010, for a bump on his gums or roof of his mouth on the right side that had been causing him pain. (Strahle Aff. ¶ 6(m); Ex. A to Strahle Aff., CCS-000022, CCS-000102,

CCS-000128.)

Howell saw Dr. Carter on May 28, 2010, June 4, 2010, and June 25, 2010, for dental evaluation and treatment. (Strahle Aff. ¶ 6(j), (k), (o); Ex. A to Strahle Aff., CCS-000008, CCS-000009, CCS- 000010, CCS-000016, CCS-000017, CCS-000018, CCS-000114, CCS-000118.) Dr. Carter found no swelling or visible fracture on June 4, 2010, though Howell was still complaining of pain at that time. (Strahle Aff. ¶ 6(k); Ex. A to Strahle Aff., CCS-000009, CCS-000017.) Dr. Carter extracted Howell's tooth number 7 on June 25, 2010, due to injury to his tooth, which he suspected was caused by a blow to the tooth. (Strahle Aff. ¶ 6(o); Ex. A to Strahle Aff., CCS-000008, CCS-000016, CCS-000114.) During the course of his evaluation and treatment of Howell, Dr. Carter ordered Amoxicillin 1000 mg for Howell on May 28, 2010, and June 21, 2010, and he ordered Ibuprofen 600 mg for Howell on June 21, 2010, and June 25, 2010. (Strahle Aff. ¶ 6(j), (m), (o); Ex. A to Ex. 5, Strahle Aff., CCS-000018, CCS-000102, CCS-000114, CCS-000118.)

With respect to Howell's allegations of shoulder pain, Howell saw Dr. Foster on August 4, 2010, and Dr. Foster assessed him with worsening right shoulder pain and decreased range of movement.(Strahle Aff. ¶ 6(s); Ex. A to Strahle Aff., CCS-000002 to CCS-000004.) On August 4, 2010, Dr. Foster changed Howell's medications. (Strahle Aff. ¶ 6(s); Ex. A to Strahle Aff., CCS-000003, CCS-000004, CCS-000113.) This included an order of Meloxicam for 7 days. (Strahle Aff. ¶ 6(r), (s), (t); Ex. A to Strahle Aff., CCS-000004, CCS-000113.) Meloxicam is a nonsteroidal anti-inflammatory drug indicated for the treatment of osteoarthritis and rheumatoid arthritis.

On August 12, 2010, Howell was seen by Dr. Foster for follow-up. (Strahle Aff. ¶ 6(t);

Ex. A to Strahle Aff., CCS-000112, CCS-000123.) Dr. Foster noted that Howell had decreased range of motion since the altercation of May 16, 2010. (Strahle Aff. ¶ 6(t); Ex. A to Strahle Aff., CCS- 000123.) At that time, Dr. Foster ordered the continuation of Elavil 50 mg for 90 days for pain. (Strahle Aff. ¶ 6(t); Ex. A to Strahle Aff., CCS-000123.) Howell had been taking Elavil before he was brought to the Corrections Facility for left shoulder pain related to a 2009 shoulder surgery by South Bend Orthopaedics. (Howell Dep. 78:20-79:5, 91:13-18.) Dr. Foster's original prescription of Elavil to Howell for shoulder pain had been made on May 13, 2010. (Strahle Aff. ¶ 6(b); Ex. A to Strahle Aff., CCS-000005, CCS-000120.) On September 15, 2010, CCS medical staff saw Howell, who complained that he was unable to raise his right arm above his shoulder, lift with his arm, or apply pressure to it since the May 2010 altercation. (Strahle Aff. ¶ 6(u); Ex. A to Strahle Aff., CCS- 000100, CCS-000108, CCS-000122.) Howell was placed on the list to see Dr. Foster for further evaluation. However, Howell was released from the Correction Facility two days later, on September 17, 2010, prior to seeing Dr. Foster. Id.

No nurse or doctor has ever told Howell that in their medical opinion his right shoulder pain is related to the May 16, 2010, altercation. (Howell Dep. 119:20-23.) Howell has experienced bone loss in his mouth that is unrelated to the May 16, 2010, altercation. (Howell Dep. 105:5-8.)

Nurses make rounds through the inmate wards every day. (Strahle Aff. ¶ 7.) In addition, the Corrections Facility maintains an electronic kiosk system through which inmates can communicate directly from their own wards with medical or corrections staff. Id. Inmates can use the kiosk system to request to see medical staff, doctors, dentists, and mental health staff at any time while they are incarcerated. Id. Through the inmate kiosk system, inmates communicate

11

directly with medical and mental health staff, and a nursing director or medical or mental health employee answers the inmate communications. Id. During the time that Howell was incarcerated in the Corrections Facility, Howell submitted 13 electronic kiosk messages directly to medical, dental, or mental health staff; he saw Dr. Carter approximately 3 times; he saw other doctors, nurses, and/or medical staff approximately 21 times; and he was administered prescribed medication approximately 241 times. (Strahle Aff. ¶ 8.) He also refused medical triage on at least 1 occasion and refused prescribed medications on at least 2 occasions. Id.

Howell's claims are brought pursuant to 42 U.S.C. § 1983. To prevail in a Section 1983 action, Howell must show not only that his constitutional rights have been violated, but that a particular defendant caused or participated in the alleged constitutional deprivation; a "causal connection, or an affirmative link" between the conduct and the defendant must exist." Wolf-Lilly v. Sonquist, 699 F.2d 864, 869 (7th Cir. 1983). Under § 1983, there is no respondeat superior liability. Perkins v. Lawson, 312 F.3d 872, 875 (7th Cir. 2002). See also Del Raine v. Williford, 32 F.3d 1024, 1047 (7th Cir. 1994) ("The decisional law is clear that there must be individual participation and involvement by a defendant, and that the concept of respondeat superior cannot be the basis of a claim under § 1983.").

The basis of Howell's Complaint is that the defendants did not keep him separate from Kidd and thus failed to protect him from Kidd. This allegation implicates the Eighth and Fourteenth Amendments. The Eighth Amendment protects convicted prisoners from cruel and unusual punishments. Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979); Robinson v. Moses, 644 F. Supp. 975 (N.D. Ind. 1986). The rights of pre-trial detainees are derived from the Fourteenth Amendment's Due Process Clause. Bell, 441 U.S. at 535 n.16. In its December 2, 2010 Opinion

and Order (DE 12), this court noted that, because Howell was a pretrial detainee when Kidd attacked him, the court will consider his claim as a Fourteenth Amendment claim. However, as indicated, "there is little practical difference between the standards utilized under the two amendments." Garvin v. Armstrong, 236 F.3d 896, 898 (7th Cir. 2001), citing Weiss v. Cooley, 230 F.3d at 1032. "An act or practice that violates the eighth amendment also violates the due process rights of pretrial detainees." Martin v. Tyson, 845 F.2d 1451, 1457 (7th Cir. 1988).

Under the Eighth Amendment, prison officials may not inflict cruel and unusual punishments on prisoners, and they have a duty to protect prisoners from violence at the hands of other prisoners. See Farmer v. Brennan, 511 U.S. 825, 833 (1994). However, not every injury suffered by one prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety. Id. at 834. Rather, an Eighth Amendment violation exists only if deliberate indifference by prison officials effectively condones the attack by allowing it to happen. Langston v. Peters, 100 F.3d 1235, 1237 (7th Cir. 1996) (citing Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996)). Only then can those officials be held liable to the injured victim. Id.

Deliberate indifference in the correctional context has two components. Farmer, 511 U.S. at 833. First, the danger to the inmate must be objectively serious, posing a substantial risk of serious harm. Id. Second, the prison official must have a sufficiently culpable state of mind—one of deliberate indifference to inmate health or safety. Id. The Farmer Court emphasized the importance of "actual knowledge," finding that because the Eighth Amendment relates only to punishment, it is not enough that the official should have known of a substantial risk or that a reasonable officer in the situation would have known of the risk. Haley, 86 F.3d at 640 (citing

13

Farmer, 511 U.S. at 842 n.8).

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer, 511 U.S. at 837. Negligence on the part of the officer is insufficient to impose liability. Haley, 86 F.3d at 640 (citing Farmer, 511 U.S. at 838). That is, an official's failure to alleviate a significant risk that he should have perceived but did not cannot be condemned as the infliction of punishment. Id. (citing Farmer, 511 U.S. at 838).

Based upon these principles, courts have entered dismissal or summary judgment against inmate plaintiffs where there is no evidence that officers who violated keep-separate orders did so with deliberate indifference. In Dolly v. Nw. Reg'l Adult Ctr., 2009 WL 2337999 (W.D. Va. 2009), a Virginia inmate alleged that jail staff failed to adequately keep other inmates away from him. When booked, the inmate informed intake staff that he was an informant on other inmates at the jail and was scheduled to testify in court against a "particular inmate" in the near future. Id. at *1. The staff placed the plaintiff and the particular inmate on a "keep separate list" but thirty days later moved the plaintiff to another pod where he was attacked by the particular inmate. A correctional officer subsequently confirmed that the plaintiff and the particular inmate should not have been placed near each other. Id. at *2. Analyzing the plaintiff's claim as an Eighth Amendment failure to protect claim, the court held that the plaintiff's claim failed because he failed to allege any culpable staff's deliberate indifference. Id. The court observed that the plaintiff acknowledged that the jail staff placed him and other inmates on "keep separated" lists.

Id. Based upon these facts, the court held that the plaintiff only presented a claim of negligence, which was not cognizable under the Eighth Amendment. Id. Accordingly, the court dismissed the plaintiff's complaint for failing to state a claim upon which relief could be granted. Id.

Likewise, in Cardenas v. Lewis, 66 F. App'x 86, 88 (9th Cir. 2003), a plaintiff inmate argued that correctional defendants were deliberately indifferent to a substantial risk to his safety because they repeatedly transferred him to units where he was in danger and because they placed him in the jail holding tank with an inmate from whom he was supposed to be kept separated. The Ninth Circuit held that even assuming that officers on duty failed to check his "keep separate" wristband before placing him in the holding tank, the plaintiff still failed to produce any evidence from which a reasonable juror might infer that the officers acted with deliberate indifference, rather than mere negligence. Id. Thus, the Ninth Circuit affirmed the district court's grant of summary judgment against the plaintiff on this issue. Id. at 89.

The defendants contend that Howell's claims against Books, Naves, Rosson and Beato fail because these defendants had no individual participation or involvement with Kidd's placement in Howell's ward.  Howell, in his response to the motion for summary judgment, acknowledges that these four defendants should be granted summary judgment due to their lack of involvement.  Thus, summary judgment will be entered in favor of these four defendants.

With respect to Morris, the defendants argue that although Morris housed Kidd and Howell together, this was an accidental, inadvertent mistake, and it was not done with deliberate indifference and thus summary judgment should be granted in favor of Morris, too.

It is undisputed that Morris made the decision to move Kidd from booking to Howell's ward, and she admits that she made this decision by mistake. But the question is whether Morris

acted with deliberate indifference to Howell. The evidence submitted shows that in the normal course of Morris' activity as a classification officer at the Corrections Facility, she would carefully review each inmate that she added to move lists to determine where he or she could be safely and appropriately housed. In assigning inmates to move lists, Morris would systematically review the classification status of all inmates in booking who had their classification interviews, and she would add these inmates to the daily move list one by one. In doing so, she would regularly examine each inmate's profile to determine whether or not he or she had any keep-separate instructions associated with him or her. Where a keep-separate instruction existed, Morris would review the instruction and make sure that an inmate was not moved to a ward with an inmate that he or she needed to be kept separate from. This regular procedure was in accordance with Corrections Facility policy and procedure.

On May 11, 2010, when Howell was booked, the Corrections Facility accurately noted the keep-separate issue between Howell and Kidd on both Howell's prisoner intake sheet and on Howell's booking screening sheet. On the same day, Howell was appropriately moved to a maximum security ward. On May 14, 2010, when Kidd was booked, the Corrections Facility accurately entered a keep-separate instruction in the Corrections Facility's computer system to keep Howell and Kidd separate. When Morris was in booking toward the end of first shift and an officer asked her where Kidd should be housed—as Kidd had not yet been placed on the day's move list— Morris accurately remembered that Kidd was classified as a maximum security inmate. And she accurately remembered that there was an open bed in Ward K45. The only mistake that occurred with respect to keeping Howell and Kidd apart was that Morris forgot to check Kidd's profile on the Corrections Facility's computer system to determine whether he had

any keep-separate instructions. Thus, it did not occur to her to keep Kidd out of Ward K45, where Howell was housed. It is undisputed that Kidd got into a physical altercation with Howell the day that Kidd was moved to Howell's ward. Thus, this is not a situation in which an inmate or officer alerted Morris to a dangerous situation or mistake in inmate housing and she failed to correct the mistake. Rather, the evidence shows that Morris' housing of these two inmates in the same ward was an unintentional mistake and not done in bad faith. The medical nurses, mental health staff, doctor and dentist of CCS provided Howell with medical evaluation and treatment after the altercation and Howell was not housed again in the same ward as Kidd. The defendants argue that Morris did not knowingly disregard an excessive risk to Howell's safety, did not draw an inference that a substantial risk of serious harm existed to Howell, and did not act with deliberate indifference. See Haley, 86 F.3d at 640; Farmer, 511 U.S. at 837, 842 n.8. The defendants contend that although the keep-separate instruction was not followed by Morris, this is at most an act of negligence, and it is not cognizable under the Fourteenth Amendment. See id.; Dolly, 2009 WL 2337999, at *2; Cardenas, 66 F. App'x at 89.

      Although Howell responded to the motion, he has not filed and served materials that he contends raise a genuine dispute, as required by N.D. Ind. L.R. 56.1(b)(1)(B). Nor has he set forth, as required by N.D. Ind. L.R. 56.1(b)(2), a section in his response brief labeled "Statement of Genuine Disputes" that identifies the material facts that Howell contends are genuinely disputed so as to make a trial necessary. At summary judgment a party must show what evidence it has that would convince a trier of fact to accept its version of the events. See Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008). To oppose summary judgment a party must marshal and present the court with the evidence he contends will prove his case. See Parker v.

Buss, 2011 WL 1062077 (N.D. Ind. Mar. 22, 2011) (citing Goodman v. Nat'l Sec. Agency, Inc., 621 F.3d 651, 654 (7th Cir. 2010). Because Howell has not set forth evidence creating a dispute of fact with respect to the evidence designated by Morris, he cannot defeat summary judgment. There is no evidence before the court that Morris knew of and disregarded an excessive risk to Howell's safety. See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Haley v. Gross, 86 F.3d 630, 640 (7th Cir. 1996). Like the facts of Dolly v. Nw. Reg'l Adult Ctr., 2009 WL 2337999 (W.D. Va. 2009) and Cardenas v. Lewis, 66 F. App'x 86 (9th Cir. 2003), the facts here do not support a finding of deliberate indifference. Accordingly, summary judgment will be granted in favor of Morris.

## Conclusion

On the basis of the foregoing, the defendants' motion for summary judgment [DE 40] is hereby GRANTED.

Entered: March 26, 2012.

s/ William C. Lee  
William C. Lee, Judge  
United States District Court
